**In re Dale ACHORN, f/d/b/a Electrical Contractors, Inc., Debtor.**

**Gary M. GROWE, Trustee, Plaintiff,**

**v.**

**GEORGE LUSSIER ENTERPRISES, INC., d/b/a Corvette City, Dale Achorn, Debtor, and Fleet Bank of Maine, Defendants.**

**Bankruptcy No. 90–10255.
Adv. No. 90–1034.**

United States Bankruptcy Court,
D. Maine.

Feb. 22, 1991.

---

in his efforts by Fleet Bank,[1] the trustee seeks to compel George Lussier Enterprises, Inc., d/b/a Corvette City ("Lussier" or "Corvette City") to turn over a 1985 Chevrolet Corvette[2] presently stored at Corvette City's facility in Manchester, New Hampshire.

Based upon the testimony and the exhibits introduced in evidence, the court hereby enters the following findings of fact and conclusions of law.[3]

*Findings of Fact*

Dale Achorn ("Achorn" or "Debtor") filed a petition for relief under Chapter 7 on May 7, 1990. Prior to the filing, he held an ownership interest in the Corvette. The car's title certificate remained in the hands of Fleet Bank ("Fleet"), which obtained a valid, perfected, first priority security interest in the vehicle[4] when it extended credit to Achorn in the amount of $10,-018.00 on April 25, 1987.[5] As of the trial date, February 12, 1991, Achorn owed Fleet $6,605.14, comprised of $5,874.54 in principal and $730.60 in interest, all of which accrued post-petition.

Before his bankruptcy, Achorn borrowed from Fleet on a number of occasions. The loans were typically secured by motor vehicles owned by Mr. Achorn.[6] From time to time, he would trade or sell encumbered cars, necessitating the bank's release of its security interest to provide clear title to third parties. Fleet would release its lien and accept a substitution of collateral if the new collateral was of equal or greater value than the collateral released and if Achorn could produce lien-free title to it.[7]

Eugene M. VanLoan III, Robert E. Murphy, Jr., Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, N.H., for defendant Corvette City.

Michael Haenn, Bangor, Me., for defendant Fleet Bank of Maine.

Gary M. Growe, Bangor, Me., trustee.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Before the court is the trustee's complaint seeking a turnover of estate property pursuant to 11 U.S.C. § 542(a). Joined

---

1. Fleet Bank of Maine is successor by merger to Merrill/Norstar Bank and Norstar Bank, each of which dealt with the Debtor. For the sake of simplicity, reference throughout this opinion will be to Fleet Bank.

2. The vehicle in question, V.I.N. 1G1YY0787F5100396, will be referred to as the "vehicle," the "car" or the "Corvette" throughout this opinion.

3. See B.R. 7052.

4. Defendant's Exhibit 2, certificate of title. For purposes of this proceeding, Fleet Bank's interest and priority are unchallenged.

5. Defendant's Exhibit 1, consumer note.

6. Testimony established that the Debtor presented himself as a collector of and dealer in automobiles.

7. According to Mr. Jack Kenney, a former bank vice-president, Fleet had agreed to collateral exchanges requested by Achorn in the past. Confirming the value of the new collateral consisted of a visual inspection coupled with reference to the National Auto Dealers Association monthly booklet of vehicle values (the "blue book").

In August 1988, Achorn suggested substituting another vehicle for the Corvette that secured Fleet's $10,018.00 note. He raised with Jack Kenney the possibility of replacing the Corvette with a 1984 Cadillac convertible as security for the loan. Although the proposal was discussed, the Debtor never tendered to Fleet the title for the Cadillac, the bank never processed the substitution, and its lien on the Corvette was never released.[8]

On August 16, 1988, the Debtor entered into a compact with Corvette City, agreeing to trade the Corvette in on a 1984 Cadillac Eldorado convertible.[9] The Corvette was given a trade in value of $15,000.00 against the Cadillac's $18,500.00 purchase price, with the balance paid in cash or by check.[10] Achorn left the Corvette at the dealership and drove away in the Cadillac. Lussier planned to sell the Corvette at once, but, around October 1, 1988, it was taken off the sales lot and moved to storage space in a nearby hangar building, where it remains. Lussier removed the car from the lot because there was a "problem with the titles" that precluded immediate resale.

Lussier repaired and reconditioned the Corvette during the period from June 8, 1989 through January 1990. Repairs were made to keep the car in running condition and to "prepare it for sale". The repairs and renovations were completed at Lussier's shop pursuant to in-house repair orders, reflecting that, at the time the repairs were made, Corvette City considered itself to be the owner of the car. None of the work was performed at the request of either Mr. Achorn or of Fleet. According to Lussier's records the work was "billed" at $779.00, a wholesale figure. The car was fitted with new tires at a neighboring business at a wholesale price of $800.00.

By February 1990, Fleet had referred Achorn's account to its collections department because of occasional payment defaults. Through Achorn, a Fleet employee attempted to locate the Corvette for possible repossession. Achorn referred her to Corvette City and, in response to her inquiries, the corporation's president informed her that the Corvette had been accepted in trade, that Corvette City had repaired and stored it, and that the Corvette would not be released to any party without payment for repairs and storage.

Without the repairs and new tires, the car would be worth $1,500.00 to $2,500.00 less than it is today. The present value of the car is $13,000.00 at retail, or $9,500.00 at wholesale, based upon the NADA blue book.[11] Daniel Lussier also explained that Corvette City has stored the car in its hangar space since approximately October 1, 1988. The company asserts that it is entitled to storage fees at the rate of $10.00 per day from that date to the present.[12]

## Conclusions of Law

The trustee invokes 11 U.S.C. § 542(a)[13] to compel Corvette City to turn the car

---

**8.** Mr. Kenney testified that, after referring to the blue book, he was satisfied that the Cadillac was of equal or greater value than the Corvette, although he apparently never inspected it firsthand. His testimony that the substitution was never processed and that the bank's lien on the Corvette was never released, or ever promised to be released, is uncontroverted.

**9.** Lussier Exhibit 1 is a copy of a Motor Vehicle Purchase Agreement/Bill of Sale, detailing the transaction. Although dated August 16, 1988, it is unsigned. Daniel Lussier, testifying for Corvette City, stated that Mr. Achorn signed a handwritten bill of sale that day.

**10.** The transaction was negotiated by a Corvette City salesman. Daniel Lussier, who was then manager of Corvette City's specialty (collectible and exotic) car division, was informed of the terms. The deal was approved finally by Mr. George Lussier, the company's president.

**11.** These values, testified to by Daniel Lussier, are unchallenged.

**12.** Mr. Lussier testified that the rates for specialty car storage in Manchester, New Hampshire range from $15.00 to $25.00 per day.

**13.** 11 U.S.C. § 542(a) provides:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the

over to him for disposition. Fleet, by reason of its security interest, seeks the same result so that it can see its collateral liquidated to satisfy its claim. Corvette City resists, asserting possessory garageman's liens for storage [14] and repairs.[15] It contends that its lien claims of $8,650.00 for storage [16] and of $1,579.00 for repairs, coupled with Fleet's $6,605.14 secured claim, exceed the worth of the Corvette, rendering it of "inconsequential value" to the estate, thereby precluding the trustee from requiring it to relinquish the car.

Without doubt, the Corvette is property of the estate.[17] Although on the commencement date he no longer had possession of the car, Mr. Achorn remained its owner of record.[18] Consistent with his statutory duties,[19] the trustee wishes to obtain the vehicle and reduce it to money through sale.[20] Given the uncontroverted evidence that the Corvette presently is worth from $9,500.00 to $13,000.00, the trustee is entitled to judgment ordering Corvette City to deliver it to him, unless its claimed liens are valid and consume all

value exceeding Fleet's unchallenged lien, rendering the car's worth to the estate of no consequence.[21]

■ In establishing a statutory garageman's lien for repairs, the "specified requisites must be strictly observed." *Iacomini v. Liberty Mutual Ins. Co.*, 127 N.H. 73, 497 A.2d 854, 857 (1985), quoting *Manchester Federal Sav. & Loan Asso. v. Letendre*, 103 N.H. 64, 68, 164 A.2d 568, 572 (1960). An essential prerequisite to the lien is the owner's consent. *Iacomini v. Liberty Mutual Ins. Co., supra*, 497 A.2d at 857. The lien's foundation is in the contractual relation between lienor and lienee. *Id. See also Hiltz v. Gould*, 99 N.H. 85, 105 A.2d 48 (1954). Corvette City's claim to a lien for repairs must fail for lack of this essential. Neither Mr. Achorn or Fleet requested that repairs be made.

According to Corvette City's own witness, maintenance repairs and reconditioning were undertaken for two reasons: first, to prepare the car for resale; and

value of such property, unless such property is of inconsequential value or benefit to the estate.

The exceptions set forth in subsection (c) and (d) are not applicable here.

14. The parties agree that the law of New Hampshire is to be applied in determining the validity and extent of Corvette City's asserted possessory liens. New Hampshire has recognized the garageman's storage lien in N.H.Rev.Stat.Ann. § 450:1, which states:

Any person who maintains a public garage, public or private airport or hangar or trailer court for the parking, storage or care of motor vehicles or aircraft or house trailers brought to his premises or placed in his care by or with the consent of the legal or equitable owner shall have a lien upon said motor vehicle or aircraft or house trailer, so long as the same shall remain in his possession, for proper charges due him for the parking, storage or care of the same.

15. New Hampshire's possessory garageman's lien for repairs found N.H.Rev.Stat.Ann. § 450:2 provides:

Any person who shall, by himself or others, perform labor, furnish materials, or expend money, in repairing, refitting or equipping any motor vehicle or aircraft, under a contract expressed or implied with the legal or equitable owner, shall have a lien upon such motor vehicle or aircraft, so long as the same

shall remain in his possession, until the charges for such repairs, materials, or accessories, or money so used or expended have been paid.

16. Through February 11, 1991, with additional accrual of $10.00 per day thereafter

17. 11 U.S.C. § 541(a)(1).

18. Defendant's Exhibit 2, certificate of title.

19. 11 U.S.C. § 704.

20. 11 U.S.C. § 363.

21. Corvette City asserts that its lien is entitled to priority over the bank. If the liens were valid, the assertion would likely prove out. *See* N.H. Rev.Stat.Ann. 382–A:9–104(c), 9–310. *See generally*, Annot., 48 A.L.R.2d 894, § 12 (1956 & Supp.1990); II G. Gilmore, *Security Interests in Personal Property § 33.3 (1965)*. However, relative priority between or among lienors is not at issue here. Given today's determination, it will not become necessary to decide the issue.

That the Debtor might assert an exemption in the Corvette, thereby consuming $1,200.00 of otherwise available equity and rendering the asset of inconsequential value to the estate is highly unlikely given the content of Maine's exemption statute and the August 1988 trade-in. *See* 14 M.R.S.A. § 4422(2).

second, to keep the car in running condition, a requirement for storage. The work was done by Corvette City for its own reasons and was "billed" on in-house repair orders. No formal or informal billing issued either to Fleet or to Achorn. In the absence of consent, the lien must fail. *Iacomini v. Liberty Mutual Ins. Co., supra.*

■ Corvette City argues that, whatever can be said about its claim for a repair lien, it has established a lien for storage charges and that the storage lien alone combines with the bank's secured claim to exhaust any value the car might hold for the estate. Although the path to decision on this point is not so brief, the pertinent principles, inimical to the storage fee lien claim, are equally clear.

New Hampshire's statute provides that a person who maintains facilities for storing motor vehicles may claim a possessory lien on a vehicle "brought to his premises or placed in his care by or with the consent of the legal or equitable owner" for "proper charges due him for the parking, storage or care of the same."[22] Just as the foundation for a garageman's or mechanic's repair lien is consent, so, too, is some form of consent the basis upon which a storage lien rests. Consent can be express, as when an owner or authorized agent places a vehicle in the care of a garageman for a term. The requisite consent can also be implied, as when an owner fails or refuses to reclaim a vehicle upon the completion of repairs, thereby necessitating storage. *See generally* Annot., 48 A.L.R.2d 894, § 4 (1956 & Supp.1990.)[23]

When Achorn left the car at Corvette City, he did so as a part of an agreement to transfer ownership in exchange for credit against the 1984 Cadillac's purchase. Delivering the car was not a temporary transfer of possession with the expectation of later reclamation. Rather, it was a surrender of possession. At the time, Corvette City was aware that Fleet held a security interest in the car.[24] It took the trade and, having done so without a "clean" title for the Corvette in hand, it also assumed the risk that its interests would remain subordinate to Fleet's.

All that Corvette City did was in furtherance of its role as a frustrated vendee. Having taken the risk of parting with the Cadillac without cementing its rights in the Corvette, it was ultimately frustrated by Achorn's contract breach and, ultimately, by his insolvency.

On the filing of the bankruptcy, Corvette City's possessory interest as ostensible vendee became subject to the interests of the trustee, as well.[25] Corvette City had not yet obtained a new title for the car. At the filing, it held no record interest in it.

Corvette City's claim against Achorn is, concededly, one for breach of contract. However, it is for breach of a purchase and sale contract, rather than breach by nonpayment for requested repairs or storage.[26] As such, it is an unsecured claim, unaided by the garageman's lien statute. Thus, the car's value to the estate is not diminished by the claimed liens.[27] The Corvette must be surrendered to the trustee.[28]

**22.** N.H.Rev.Stat.Ann. § 450:1, *supra* n. 14.

**23.** *Cf. State v. Hill,* 115 N.H. 37, 332 A.2d 182 (1975) (affirming criminal conviction for interference with rights of towing and storage lienor under N.H.Rev.St.Ann. § 266:3).

**24.** Lussier Exhibit 1, the purchase agreement lists Fleet as lienor, albeit as lienor on the Cadillac. Thus, the parties contemplated the substitution of collateral that Achorn earlier had suggested to the bank, but which was never effected.

**25.** *See, e.g.,* 11 U.S.C. § 544.

**26.** The testimony of Mr. Lussier makes this conclusion plain. When asked if the Corvette would be released voluntarily without payment for storage and repairs, he responded that, absent payment, it would not be surrendered "until we get the Cadillac back."

**27.** At trial, Corvette City raised a potential *quantum meruit* claim on account of improvements it made to the vehicle. However, such a claim is properly characterized as one for "reliance damages" arising from Achorn's breach of his promise to convey clear title. *See* Restatement (Second) of Contracts § 90 (1981). That issue is not before the court. In any event, it is not secured by the asserted liens.

**28.** The question of to what extent Fleet Bank, or any other entity, may be surcharged for the value of post-petition storage charges under 11 U.S.C. § 506(c) is not before the court. In that

## CONCLUSION

For the reasons set forth above, judgment will be entered for the trustee.

regard, however, it should be noted that pre-filing storage, like the repair work, was a consequence of the aborted sale. The value of that storage is or may become a component of Corvette City's unsecured breach of contract claim.

Post-petition storage fees, which unquestionably preserved the asset, should have accrued no longer than through July 31, 1990, when the trustee filed this action demanding the vehicle's release.